UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
J.H.,

                          Plaintiffs,

          -against-                                    **MEMORANDUM & ORDER**

                                                          (16-cv-2044)

WILLIM J. BRATTON, in his official capacity
as Commissioner of the New York City Police
Department ("NYPD"), the New York City
Police Department, THE CITY OF NEW
YORK and THE CITY OF NEW YORK
POLICE DEPARTMENT, NEW YORK CITY
POLICE OFFICERS "John Does 1-10", and
SUPERVISORY, TRAINING AND POLICY
PERSONNEL Jane/John Does 10-20,

                          Defendants.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

          Plaintiff J.H., a Muslim woman, brought this action alleging that her rights under the U.S.

and New York Constitutions to freely exercise her religion were violated when the New York

Police Department ("NYPD") compelled her to remove her religious headscarf during the taking

of an official Department photograph as part of post-arrest processing.  Defendants have moved

under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim on which relief

can be granted.  (Dkt. 11.)  For the reasons stated herein, Defendants' motion is GRANTED in

part and DENIED in part.

# BACKGROUND[1]

## I.     NYPD INTERIM ORDER 29

On March 2, 2015, in response to ongoing civil rights litigation, the NYPD issued an interim order—Interim Order 29—to establish new protocols for taking post-arrest photographs of arrestees who refuse to remove religious head coverings in the presence of NYPD officers for religious reasons.  (Dkt 1 ("Compl.") ¶¶ 49-53; Compl., Ex. A.)  In relevant part, Interim Order 29 states that an arrestee must be informed that he or she will be required to remove any head covering, including any religious head covering, during the taking of an official Department photograph as part of the NYPD's post-arrest procedures.  (Compl., Ex. A.)  Interim Order 29 further provides that, in the event an arrestee refuses to remove his or her religious head covering, the officer seeking to administer the photograph must inform the arrestee that he or she is required to remove the head covering, but may do so in another NYPD facility outside the presence of officers of the opposite gender.  (*Id*.)  The officer must also inform the arrestee that electing to have the photograph taken in private at another location could cause a delay in the processing of his/her arrest.  (*Id*.)

If an arrestee elects to have his or her photograph taken in private, the officer seeking to administer the official Department photograph must notify a central authority within the NYPD of the gender of the arrestee, so that arrangements can be made to photograph the person outside the presence of officers of the opposite gender.  (Compl., Ex. A.)  The officer seeking to administer the official Department photograph is then required to transport the arrestee to the NYPD's Mass

---

[1] The facts in this section are drawn from the allegations contained in the Complaint and materials that the Court has judicially noticed.  These facts are deemed to be true for the purposes of this motion.  *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (a district court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff).

Arrest Processing Center ("MAPC") between the hours of 8:00 a.m. and midnight, where the arrestee's official Department photograph will be taken, without a head covering and outside the presence of officers of the opposite gender. (*Id.*)

## II.    PLAINTIFF'S ARREST

On September 12, 2015, approximately six months after the NYPD issued Interim Order 29, Plaintiff, a Muslim woman, was asked to report to the NYPD's 71st precinct in Brooklyn, New York. (Compl. ¶ 21.) When she arrived, she was placed under arrest. (*Id.* ¶ 22.) Plaintiff was wearing a veil,[2] which is part of her religious practice, and she was permitted to keep wearing the veil for an arrest photograph taken at the precinct. (*Id.*) After the photograph was taken, Plaintiff was handcuffed to a bench in the precinct until the next morning. (*Id.* ¶ 23.)

The next morning, the NYPD transferred Plaintiff to the NYPD's central booking facility ("Central Booking") for additional post-arrest processing. (Compl. ¶ 24.) Upon arriving at Central Booking, Plaintiff was taken to an area where her photograph could be taken. (*Id.* ¶ 25.) Approximately ten NYPD police officers and five detainees—all of whom were male—were also present in the area where Plaintiff's photograph was to be taken. (*Id.* ¶ 25)

Two NYPD officers instructed Plaintiff that she must remove her veil for the photograph. (Compl. ¶¶ 27–28.) Plaintiff told the officers that she could not remove her veil due to her religious obligations. (*Id.* ¶ 29.) Plaintiff told the officers that her religious beliefs required her to wear the veil, and that she could not remove the veil in the presence of men. (*Id.* ¶ 30.) The officer taking the photograph told Plaintiff that her religion was irrelevant and that she must remove her veil, regardless of her religious beliefs. (*Id.* ¶ 31.) Plaintiff then requested that her photograph be

---

[2] The Complaint refers to J.H.'s head covering as a "veil," but also alleges that the veil is a "religious garment known as the Hijab . . . [which is] a veil that covers her hair." (Compl. 20.)

taken in private, outside the presence of men, by a female officer. (*Id.* ¶ 32.) The photographing officer responded, in substance, "what do you think you are here for . . . [a] photo shoot?" (*Id.* ¶ 33.) The officer then instructed Plaintiff that she was required to remove her veil. (*Id.* ¶ 34.) Plaintiff complied. (*Id.*)

When Plaintiff removed her veil, the male officers and detainees stared at her and made comments. (Compl. ¶ 35.) In particular, the photographing officer commented "[w]ow, wow, wow," referring to Plaintiff's hair. (*Id.* ¶ 37.) Plaintiff felt violated, embarrassed, and humiliated. Plaintiff broke into tears and was visibly upset and embarrassed. (*Id.* ¶¶ 36, 39.)

After her photograph was taken, Plaintiff put her veil back on. (Compl. ¶ 38.) The male detainees continued to laugh at Plaintiff and make inappropriate comments about her. (*Id.* ¶ 39.) Plaintiff was then escorted to a medical examiner, who had an opportunity to review a copy of the photograph taken of Plaintiff without her veil on. (*Id.* ¶ 40.) Seeing that Plaintiff was wearing a veil in person, but not in the photograph, the medical examiner told Plaintiff that she should not have been required to remove her veil for the photograph and that it was against policy to require her to do so. (*Id.*)

After seeing the medical examiner, Plaintiff was escorted to the women's holding cell in Central Booking. (Compl. ¶ 41.) An officer there approached Plaintiff and asked her why she had been photographed without her veil. (*Id.*) Plaintiff told the officer that she had been ordered to remove her veil for the photograph. (*Id.*) The officer told Plaintiff that it was improper and a violation of NYPD policy to order an arrestee to remove a religious veil for a post-arrest photograph. (*Id.*) The officer explained that, pursuant to NYPD policy, if Plaintiff did not want to be photographed without her veil in the presence of male officers, she could have been transferred to another NYPD facility to be photographed in private by a female officer. (*Id.*)

The outcome of Plaintiff's arrest is unclear from the record, but, sometime thereafter, Plaintiff filed a notice of claim against Defendant the City of New York ("the City"), alleging that her civil rights were violated when she was ordered to remove her veil for a photograph in the presence of men.[3] (Compl. ¶ 6.) On February 3, 2016, a hearing was held concerning Plaintiff's notice of claim pursuant to New York General Municipal Law § 50-h. (*Id.*)[4]

Plaintiff commenced this action on April 25, 2016, by filing a complaint in this Court. (Compl.) Plaintiff alleges the following causes of action: (i) violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (Compl. ¶¶ 57–65), (ii) deprivation of Plaintiff's right under the U.S. Constitution to freely exercise her religion (Compl. ¶¶ 66–73), (iii) religious discrimination in violation of the New York Constitution (Compl. ¶¶ 74–77), (iv) intentional infliction of emotional distress (Compl. ¶¶ 78–84), (v) negligent infliction of emotional distress (Compl. ¶¶ 85–91), and (vi) negligent hiring, retention, training, and supervision (Compl. ¶¶ 92–100).

Defendants now move under Fed. R. Civ. P. 12(b)(6) to dismiss each of Plaintiff's claims for failure to state a claim on which relief can be granted.

## DISCUSSION

### I.   LEGAL STANDARD

To withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The liberal notice pleading standard of Fed. R. Civ. P. 8(a) only requires that a complaint set forth "a short and plain statement of the claim showing that the

---

[3] The City does not suggest that Plaintiff's notice of claim was untimely.

[4] The record does not indicate the status or result of Plaintiff's 50-h proceedings.

pleader is entitled to relief." *Id.* at 570. The complaint need not set forth "detailed factual allegations," but the plaintiff must present "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. In evaluating a 12(b)(6) motion to dismiss, the district court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir. 2006).

## II.    ANALYSIS

Defendants move under Fed. R. Civ. P. 12(b)(6) to dismiss each of Plaintiff's claims. The Court addresses each claim in turn.

### A. Violation of Due Process

Plaintiff argues that Interim Order 29 violates the Due Process Clause of the Fourteenth Amendment because it is unconstitutionally vague. (Pl.'s Br. 4–11.) Specifically, Plaintiff takes issue with the provision of Interim Order 29 that instructs a police officer to notify any arrestee who wishes to avail themselves of the protocols for being photographed in private that "their arrest processing may be delayed due to operational requirements incumbent in using the [private photographing procedures]." (*Id.*; *see also* Compl. ¶ 62; Compl., Ex. A, at 2.) Plaintiff argues that, in failing to specify the amount of time by which an arrestee's processing may be delayed, Interim Order 29 "imposes an undue burden on the constitutional rights of arrestees." (Compl. ¶ 62.) In response, Defendants argue, first, that Plaintiff lacks standing to challenge Interim Order 29 on vagueness grounds, and, second, that Plaintiff's vagueness challenge fails on the merits. (Defs.' Br. 4–8.)

The Court agrees with Defendants that Plaintiff lacks Article III standing to challenge Interim Order 29 on the ground of vagueness. To establish Article III standing for retrospective

relief, such as damages, a plaintiff must allege "an injury in fact . . . [that is] fairly traceable to the actions of the defendant . . . [which would] be redressed by a favorable [court] decision." *Marcavage v. City of N.Y.*, 689 F.3d 98, 103 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Here, Plaintiff does not allege that she was told that her arrest processing would be delayed if she availed herself of the private photographing procedures established in Interim Order 29. (*See* Compl.) Indeed, Plaintiff asserts that "she was not given the benefit of the procedure" at all. (Pl.'s Br. 5.) Given this admission, Plaintiff cannot establish that she suffered any injury in fact arising from an allegedly vague provision in Interim Order 29 because, by her own admission, that provision was never applied to her. (Pl.'s Br. 5.)

Plaintiff also lacks standing to seek prospective relief with respect to the allegedly vague provisions of Interim Order 29. To establish standing for prospective relief, "a plaintiff must show, *inter alia*, 'a sufficient likelihood that he or she will again be wronged in a similar way.'" *Marcavage*, 689 F.3d at 103 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Plaintiff has alleged no facts showing a concrete and real likelihood (i) that she will be arrested again in the future, (ii) that after being arrested, she will be given the vague instruction that her arrest processing will be "delayed" if she avails herself of the private photographing procedures established in Interim Order 29, and (iii) that due to the vagueness of that instruction, she will choose to remove her headscarf in the presence of men instead of availing herself of the procedures. In the absence of such allegations, the Court will not assume them. Plaintiff lacks standing to seek prospective relief with respect to the allegedly vague provisions of Interim Order 29.

For these reasons, the Court grants Defendants' motion to dismiss Plaintiff's Due Process claim for lack of constitutional standing. Having ruled that Plaintiff lacks standing for this claim, the Court need not address its merits.

**B. Free Exercise of Religion**

To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment rights." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Plaintiff alleges that her right under the U.S. Constitution to freely exercise her religion was infringed when an NYPD officer ordered her to remove her headscarf for a post-arrest photograph at Central Booking. (Compl. ¶¶ 66–73.) Although it is not entirely clear from her complaint, Plaintiff appears to assert two distinct theories of liability for violation of her rights under the U.S. Constitution to freely exercise her religion.[5] First, Plaintiff appears to assert a *Monell* claim against the NYPD based on its policy, pursuant to Interim Order 29, of requiring arrestees to remove head coverings during their official Department photograph in Central Booking. (Pl.'s Br. 13–15.) Second, Plaintiff asserts that "individual Defendants" violated her free-exercise rights by requiring her to remove her head covering for a post-arrest photograph in the presence of male officers and inmates. (Compl. ¶¶ 32, 40–41, 56, 66–73.)

1. *Monell* Claim

a. *Constitutional Challenge to Interim Order 29*

To plead a *Monell* claim, a plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Polo v. United States*, 2016 WL 4132250, at *3 (E.D.N.Y. Aug. 3, 2016) (quoting *Wray v. City of N.Y.*, 490 F.3d

---

[5] The Court feels compelled to note that it is difficult to tell from Plaintiff's Complaint and opposition briefing what theories her claims are based on, but the Court has endeavored to read her pleadings in the light most favorable to a cognizable claim.

189, 195 (2d Cir. 2007)).  Plaintiff alleges that Interim Order 29, which was promulgated in March 2015, is evidence of an NYPD policy of requiring any arrestee with a head covering to remove the head covering for his or her official Department photograph at Central Booking.  (Compl. ¶ 55; Compl., Ex. A (Interim Order 29).)  Plaintiff further alleges that this department-wide policy violated her free-exercise rights when she was required to remove her head covering for a post-arrest photograph at Central Booking.  (*Id.*)  The City of New York concedes that it has a department-wide policy of requiring arrestees to remove their head coverings for their official Department photographs (Defs.' Br. 15), but disputes that this policy is unconstitutional.

It is unclear to the Court whether Plaintiff's argument is that a policy requiring all arrestees to remove their head coverings for an arrest photograph, regardless of whether the policy allows the head covering to be removed in a manner consistent with the arrestee's religious beliefs, violates the Free Exercise Clause; in other words, that requiring arrestees to remove their head coverings can never be constitutional.  Assuming that this is at least part of Plaintiff's argument, the Court addresses that issue.

The Second Circuit has held that "[i]t is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the 'incidental effect' of an otherwise valid neutral provision."  *Seabrook v. City of N.Y.*, 210 F.3d 355, at *1 (2d Cir. Apr. 4, 2000) (Table). "Where the government seeks to enforce a law that is neutral and of general applicability, . . . it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices."  *Fifth Ave. Presby. Church v. City of N.Y.*, 293 F.3d 570, 574 (2d Cir. 2002).  The policy that Plaintiff challenges—*i.e.*, requiring arrestees to remove head coverings for post-arrest photographs—is a neutral policy of general applicability, regardless of

an arrestee's religious beliefs.[6] Furthermore, the Court finds that the policy is reasonably related to the City's obvious and legitimate interest in having a photographic record of arrestees from which a later identification can be made. (Def.'s Br. 9–12 (citing *Zargary v. City of N.Y.*, 607 F. Supp. 2d 609, 610 (S.D.N.Y. 2009), *aff'd*, 412 F. App'x 339, 341–42 (2d Cir. 2011)). Thus, to the extent that Plaintiff's argument is that *any* policy requiring arrestees to remove their head coverings for arrest photos is unconstitutional, that argument fails, because the Court would need to know more about the policy to evaluate its constitutionality, namely, whether the policy, either on paper or in practice, allows or prohibits religious accommodations with respect to the removal requirement. In other words, as explained further below, the mere fact that the NYPD requires arrestees to remove their head coverings for arrest photographing is not itself unconstitutional, but the failure to allow a religious accommodation with respect to that removal may be unconstitutional.

Furthermore, to the extent Plaintiff is challenging the constitutionality of the procedures established by Interim Order 29, which was the policy in place when Plaintiff was arrested and provides for religious accommodation with respect to head coverings, that claim also fails because Interim Order 29 was not applied to her. Rather, she was subjected to alleged conduct that *deviated* from that policy. Thus, Defendants' motion to dismiss Plaintiff's free exercise claim against the City is granted to the extent Plaintiff challenges the constitutionality of the procedures established in Interim Order 29.

---

[6] Plaintiff does not allege any facts suggesting that the NYPD's policy of requiring the removal of head coverings was implemented to target a particular religion or motivated by any religious animus, as would be required to invoke a more stringent standard of review. *See, e.g.*, *Muhammad v. N.Y.C. Transit Auth.*, 52 F. Supp. 3d 468, 489–90 (E.D.N.Y. 2014); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1992).

### b. Failure to Train

Plaintiff also asserts a *Monell* claim against the City based on the NYPD's alleged failure to train its officers with respect to the accommodation procedures of Interim Order 29. (Compl. ¶ 56.) "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *Jenkins v. City of N.Y.*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*

This type of *Monell* claim has three elements. *Jenkins*, 478 F.3d at 94. "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* (citation omitted). "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.* "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* In addition, the plaintiff must demonstrate that the municipal employee's "shortcomings . . . resulted from . . . a faulty training program rather than from negligent implementation of a sound program or other, unrelated circumstances." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 390-91).

As to the first two elements, the Court easily finds that Plaintiff has met her pleading burden. The NYPD's decision to adopt Interim Order 29, which affords exactly the religious

accommodation Plaintiff was not given in this case, indicates that NYPD policymakers knew "to a moral certainty" that their employees would confront arrestees, like Plaintiff, whose religious beliefs prohibited them from removing their head coverings in the presence of members of the opposite gender. The NYPD's past litigation, which prompted it to promulgate Interim Order 29, suggests that there was a history of NYPD employees mishandling this very situation.

As to the third element—whether a "wrong choice" by a police officer "will frequently cause the deprivation of a citizen's constitutional rights"—a predicate issue must be addressed, namely, whether the NYPD causes a "deprivation of a citizen's constitutional rights" when it requires an arrestee to remove her head covering in the presence of male officers, notwithstanding her request to have the photograph taken in the presence of female officers due to the requirements of her religious beliefs.[7] With respect to this significant constitutional issue, the Court notes that the Second Circuit has not addressed whether an arrestee who asserts an objection to removing a religious head covering for post-arrest photographing has a constitutional right to have the photograph taken outside the presence of members of the opposite gender. In the absence of governing Circuit authority, this Court finds guidance in the body of caselaw addressing free-exercise claims brought by prisoners seeking accommodation of their religious practices in the penological context.[8] That caselaw establishes a useful framework for determining whether a

---

[7] This predicate issue must be addressed because, if the Constitution does not require the religious accommodation contemplated in Interim Order 29, the NYPD's deviation from Interim Order 29 would not constitute a constitutional deprivation.

[8] Although "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," prisoners are nonetheless entitled to reasonable accommodation of their religious practices, even when incarcerated. *See Salahuddin v. Goord*, 467 F.3d 263, 273–74 (2d Cir. 2006) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). An arrestee in the custody of the police is entitled to at least the same reasonable accommodation as a prisoner. *See id.* (applying a "less restrictive" review to prison policies than would be applied outside the prison context). Accordingly, the Court adopts the framework used in the prison context to evaluate

government authority must modify its facially neutral policies to accommodate a person's religious practices:

> Courts must evaluate four factors in making [this] determination: [1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests.

*Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

Under this framework, the Court concludes that Plaintiff has plausibly alleged a constitutional right to have her official Department photograph taken outside the presence of male officers, as required by her religious beliefs. With respect to the first factor, as noted above, the Court recognizes the NYPD's legitimate interest in having a photographic record of arrestees from which a later identification can be made. With respect to the second factor, the Court finds that female arrestees whose religious beliefs prohibit them from removing their head coverings in the presence of men have no alternative means of complying with the NYPD's post-arrest photographing policy while adhering to their religious beliefs, other than to have their photograph taken outside the presence of men. With respect to the third factor, the Court finds that Plaintiff has plausibly alleged that the impact on NYPD resources of accommodating Plaintiff's religious beliefs would be minimal, especially considering that the NYPD has instituted just such a policy of accommodation in Interim Order 29. Finally, with respect to the fourth factor, the Court finds that accommodating an arrestee's request, based on religious practices, to have his or her

---

whether an arrestee's requested accommodation is required by the Constitution, while keeping in mind that the arrestee's right to accommodation is arguably greater than that of a prisoner.

photograph taken outside the presence of members of the opposite gender would have, at most, a *de minimis* adverse effect on the NYPD's valid interests in having a photographic record of arrestees from which a later identification can be made.

Having concluded that Plaintiff satisfies the first three elements of a failure to train claim, the only remaining question is whether Plaintiff has plausibly alleged that the NYPD officers who handled her official Department photograph deviated from Interim Order 29 due to a faulty training program. The facts alleged are compelling on this point. As alleged in the complaint, when Plaintiff was taken to Central Booking following her arrest, she was told to remove her veil for the official Department photograph, in the presence of approximately *ten* NYPD police officers and five detainees, all of whom were male. Despite Plaintiff telling the officers that she could not remove her veil in front of men for religious reasons, the officer who was taking the photograph told her that her religion was irrelevant and that she had to remove her veil regardless of her religious beliefs. Plaintiff then requested that her photograph be taken in private, outside the presence of men, by a female officer, to which the photographing officer responded, in substance, "what do you think you are here for . . . [a] photo shoot?" Over Plaintiff's objections, made expressly on religious grounds, the officers then insisted that Plaintiff remove her veil in the presence of men, and then commented inappropriately when she did.

While the Court recognizes that isolated incidents ordinarily are insufficient to show a systemic issue for *Monell* purposes, here, Plaintiff alleges that approximately *ten* officers were present when she was forced to remove her veil over her religious objection, that she was taunted by one or more of these officers when she objected, and that these officers were working in Central Booking, which is *the* unit where all arrestees' Department photographs are taken. Reading the complaint in the light most favorable to Plaintiff, the Court infers, based on these facts alleged,

that the NYPD failed to adequately train its Central Booking officers on the religious accommodation requirements of Interim Order 29.

## 2. Claim Against "Individual Defendants"

Although it is not entirely clear from her pleadings, Plaintiff appears to allege that her right under the U.S. Constitution to freely exercise her religion was violated by individual NYPD officers, when they, in deviation from Interim Order 29, ordered Plaintiff to remove her head covering in the presence of male officers and inmates. (Compl. ¶¶ 32, 40–41, 56, 66–73.)

As noted above, the Court concludes that Plaintiff has plausibly alleged a constitutional right to have her official Department photograph taken outside the presence of male officers, as required by her religious beliefs. Nonetheless, the Court rules that Plaintiff cannot sustain a free-exercise claim against the individual NYPD officers who ordered her to remove her head covering in the presence of male officers and inmates. "Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins*, 478 F.3d at 87. Plaintiff points to no authority existing prior to her arrest in September 2015 that "clearly established" that requiring a female arrestee to remove her religious head covering for an official Department photograph in the presence of male officers would be a violation of the arrestee's rights under the First Amendment to the U.S. Constitution. The Court likewise is aware of none. Furthermore, the existence of a police policy does not constitute clearly established law, nor does an officer's knowledge of the policy satisfy the "objectively reasonable" belief test for purposes of denying qualified immunity. Plaintiff's free-exercise claims against the individual John Doe Defendants therefore would ultimately fail.

For these reasons, the Court grants Defendants' motion to dismiss Plaintiff's claim under the free exercise clause of the First Amendment to the U.S. Constitution.

### C. State Law Claims

Under New York law, Plaintiff alleges claims of (i) religious discrimination in violation of the New York Constitution (Compl. ¶¶ 74–77); (ii) intentional infliction of emotional distress (Compl. ¶¶ 78-84); (iii) negligent infliction of emotional distress (Compl. ¶¶ 85–91); (iv) negligent hiring and retention (Compl. ¶¶ 92–96); and (v) negligent training and supervision (Compl. ¶¶ 97–100).

#### 1. Religious Discrimination

In addition to her free exercise claim under the U.S. Constitution, Plaintiff also asserts a claim of religious discrimination under the New York Constitution. Article I of the New York Constitution, titled Bill of Rights, protects the "[f]reedom of worship; religious liberty." N.Y. Const., Art. I, § 3. Section 11 of the New York Bill of Rights prohibits "discrimination because of race, color, creed, or religion." N.Y. Const., Art. I § 11. Rather than explain the contours of these rights, the parties have devoted most of their arguments on this issue to debating whether the New York Constitution implies a private right of action for money damages based on religious discrimination. (*See* Pl.'s Br. 17; Def.'s Br. 16.) As an initial matter, the Court holds that Plaintiff does not have a private right of action for religious discrimination under Section 11 of the New York Constitution. This conclusion flows directly from the New York Court of Appeals' decision in *Brown v. New York*, 674 N.E. 2d 1129 (1996), which held that "[i]t is implicit in the language of [the second sentence of Section 11], and clear from a reading of the constitutional debates, that this part of the section was not intended to create a duty without enabling legislation but only to

16

state a general principle recognizing other provisions in the Constitution . . . ."  674 N.E. 2d at 1139-40.

The more difficult question is whether Plaintiff has a private right of action under Section 3 of the New York Bill of Rights.  This appears to be a novel question of New York law.  In *Martinez v. City of Schenectady*, 761 N.E. 2d 560 (2001), building on its decision in *Brown v. New York*, *supra*, the New York Court of Appeals provided general guidance for the circumstances in which a court may recognize an implied right of action to enforce provisions of the New York Constitution.  761 N.E. 2d at 563–64.  As a preliminary matter, the *Martinez* court stated that the inquiry is informed by two interests:  "the private interest that citizens harmed by constitutional violations have an avenue of redress, and the public interest that future violations be deterred."  *Id.* at 563.  The *Martinez* court then clarified that courts should recognize an implied right of action under the New York Constitution only where the implied right is "necessary to effectuate the purpose of the constitutional protections the plaintiff invokes," and "appropriate to ensure full realization of [the plaintiff's] rights."  *Id.* at 563–64; *accord Bullard v. New York*, 763 N.Y.S. 2d 371, 374 (App. Div. 2003); *Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 522-23 (S.D.N.Y. 2013).

At least one federal court has considered whether to recognize an implied right of action under the New York Constitution for the type of claim Plaintiffs seek to pursue in this case—*i.e.*, a claim alleging infringement of the right under the New York Constitution to freely exercise one's religion.  *See Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198 (E.D.N.Y. 2006).  In *Muhammad*, the court declined to recognize an implied right of action under Article I, Section 3 of the New York Constitution because the plaintiffs in that case had "at least [one] alternative

avenue"—specifically, a claim under the New York Human Rights Law, N.Y. Exec. Law §§ 296-97—"for redressing the alleged religious discrimination." 450 F. Supp. 2d at 211–12.

Numerous other courts have applied the *Martinez* decision to determine whether to recognize an implied right of action under other provisions of the New York Constitution. *See, e.g.*, *Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (collecting cases). The general trend through those cases is that, where alternative remedies are available for an alleged violation of rights under the New York Constitution—whether those remedies are under state or federal law—a court does not recognize an implied right of action under the New York Constitution. *See id.* (collecting cases). Under this line of cases, the Court could dismiss Plaintiff's claim under the New York Constitution because, as the Court has already held, Plaintiff may seek remedies under the U.S. Constitution. *See supra.*

Nonetheless, the Court declines to dismiss Plaintiff's claim under the New York Constitution at this time. Although there is a trend in federal caselaw to decline to recognize an implied right of action under the New York Constitution where there is an adequate remedy under federal law, *see Biswas*, 973 F. Supp. 2d at 522, these cases do not identify any basis in New York law to deny a right of action under the New York Constitution based on remedies that may be obtainable under federal law. *See id.* Given that the New York Constitution creates rights and protections that are independent from the rights and protections afforded under federal law, *see, e.g.*, *Immuno AG v. Moor-Jankowski*, 657 N.E.2d 1270, 1277–78 (N.Y. 1991), the Court is

reluctant to conclude that Plaintiff's claim under federal law is adequate to fully vindicate her rights under the New York Constitution.[9]

With respect to the merits of Plaintiff's religious discrimination claim, Defendants assert that Plaintiff's claim must fail because "she was told at Central Booking that regardless of one's religion, religious headwear must be removed for the photograph," and because "Interim Order 29 . . . makes no distinction between types of religious headgear that an arrestee may wish to keep on." (Def.'s Br. 16.) Defendants' response, however, does not fully address the constitutional issue raised by this case, *i.e.*, whether under Article I, Section 3 of the New York Constitution, Plaintiff was entitled to a religious accommodation with respect to the NYPD's generally applicable headgear removal policy. Defendants do not cite any caselaw on this issue, nor do they explain how the facts they assert, if proven, would defeat a claim of religious discrimination under this provision of the New York Constitution. Absent that authority,

---

[9] If, at a later stage of proceedings, Defendants wish to re-assert their argument that Plaintiff does not have a private right of action under the New York Constitution, Defendants should (i) identify New York state law authority for the proposition that an adequate remedy under federal law is sufficient to preclude an implied right of action under the New York Constitution, and (ii) explain in non-conclusory fashion how Plaintiff's religious rights under the New York Constitution are, in these factual circumstances, adequately protected by the remedies she may seek under federal law. In addition, Plaintiff should be aware that, if this issue is raised again in future stages of this action and, in the interim, the New York courts have not provided any guidance on whether an implied right of action exists under Section 3 of the New York Bill of Rights, the Court will likely decline to exercise supplemental jurisdiction over Plaintiff's claim under that section, on the ground that it "raises a novel or complex issue of State law." *Kroshnvi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014). Plaintiff's counsel should consider the potential ramifications of such a ruling in deciding whether to continue pursuing Plaintiff's State constitutional claim in this court.

Defendants have failed to demonstrate that Plaintiff's allegations of religious discrimination fail on their merits.

For these reasons, the Court denies Defendants' motion to dismiss Plaintiff's claim of religious discrimination under the New York Constitution.

### 2. Intentional Infliction of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show (i) extreme and outrageous conduct, (ii) intent to cause, or disregard of a substantial likelihood of causing, severe emotional distress, (iii) a causal connection between the conduct and injury, and (iv) severe emotional distress. *Bailey v .N.Y. Law School*, 2017 WL 835190, at *10 (S.D.N.Y. Mar. 1, 2017) (citing *Howell v. N.Y. Post. Co.*, 612 N.E.2d 699, 702 (N.Y. 1993))).

Plaintiff alleges that she was the victim of IIED by the police officers at Central Booking who refused to let her have her photograph taken outside the presence of men by a female photographer, mocked her as she made her repeated requests, and then made demeaning comments to her after she removed her headscarf. (Compl. ¶¶ 27–40, 78–84.) Defendants argue that Plaintiff's IIED claim must fail because the complaint "lacks any allegation of extreme or outrageous[] conduct exceeding all reasonable bounds of decency." (Def.'s Br. 20.)

In general, the requirements of an IIED claim "are exceedingly difficult to satisfy, as the tort refers to conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Fleming v. Hymes-Esposito*, 2013 WL 1285431, at *9 (S.D.N.Y. Mar. 29, 2013) (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E. 2d 86, 90 (N.Y. 1983)). Indeed, courts in New York have disallowed IIED claims based on findings that various types of conduct, although

highly anti-social and offensive, do not rise to the level of extremity and outrageousness required to plead an IIED claim. *See, e.g.*, *Anderson v. Abodeen*, 816 N.Y.S. 2d 415, 432 (App. Div. 2006) (plaintiff's allegations that his supervisor "displayed . . . nude photos [of plaintiff]" in the workplace "does not show conduct sufficiently outrageous to support a claim of intentional infliction of emotional distress"); *Seltzer v. Bayer*, 709 N.Y.S. 2d 21, 23 (App. Div. 2000) (holding that "dump[ing] a pile of cement on [neighbor's sidewalk], toss[ing] lighted cigarettes into his backyard, thr[owing] eggs on his front steps, and threaten[ing] once to paint a swastika on his house . . . do not rise to the level of outrageousness or the kind of 'deliberate and malicious campaign of harassment or intimidation'" required to state an IIED claim).

Nevertheless, the Court finds that Plaintiff's unique factual allegations in this case— namely, that ten male officers of the NYPD, while they had Plaintiff in their custody, forced Plaintiff to remove her headscarf in their presence and the presence of five male detainees (an act that, the Court infers, was akin to being stripped naked, from Plaintiff's religious perspective) in violation of NYPD policy and despite Plaintiff's repeated objections on religious grounds, and then made sarcastic and demeaning comments about her physical features after she removed her headscarf—plausibly allege behavior that is sufficiently "extreme and outrageous" to support an IIED claim. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's claims for intentional infliction of emotional distress.[10]

---

[10] The Court notes, however, that "[i]t is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity." *Noonan v. City of N.Y.*, 14 Civ. 4084, 2015 WL 3948836, at *7 (S.D.N.Y. June 26, 2015) (quoting *Lauer v. City of N.Y.*, 659 N.Y.S. 2d 57, 58 (1997)). Accordingly, Plaintiff's IIED claim may proceed only against the individual officers who were involved in the misconduct alleged.

### 3. Negligent Infliction of Emotional Distress

To state a claim for negligent infliction of emotional distress, a plaintiff must allege "[a] breach of the duty of care resulting directly in emotional harm . . . when the mental injury is a direct, rather than a consequential, result of the breach and when the claim possesses some guarantee of genuineness." *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 881 N.E. 2d 1187, 1189 (N.Y. 2008). As fleshed out by New York caselaw, the latter element—guarantees of genuineness—generally requires a specific, recognized type of negligence that obviously has the propensity to cause extreme emotional distress, "[such as] the mishandling of a corpse or the transmission of false information that a parent or child had died." *Taggart v. Costabile*, 14 N.Y.S. 3d 243, 253 (App. Div. 2015). Otherwise, the "guarantees of genuineness" element "generally requires that the breach of the duty owed directly to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety." *Id.*

Here, Plaintiff's allegations fall short of the circumstances that could sustain a claim for negligent infliction of emotional distress. Plaintiff does not allege any specific duty owed by any Defendant to Plaintiff; she does not allege a type of emotional distress that has traditionally been recognized by New York courts as giving rise to a negligent infliction of emotional distress claim; and she does not allege negligence that endangered Plaintiff's physical safety or caused Plaintiff to fear for her physical safety. For these reasons, the Court grants Defendants' motion to dismiss Plaintiff's claim for negligent infliction of emotional distress.

### 4. Negligent Hiring, Retention, Training and Supervision

The parties agree that, in general, "[w]here an employee is acting within the scope of his or her employment, the employer is liable under a theory of respondeat superior and no claim may proceed against the employer for negligent hiring or retention." (Pl.'s Br. 21 (quoting

*Rossetti v. Bd. of Educ. of Schalmont Cent. Sch. Dist.*, 716 N.Y.S. 2d 460 (App. Div. 2000));
Def..'s Br. 21–22.)  As Plaintiff concedes, her complaint alleges that the NYPD officers who
ordered her to remove her veil at Central Booking were acting within the scope of their
employment.  (Def.'s Br. 21–22; Pl.'s Br. 21; Compl. ¶¶ 15–19.)  Nonetheless, Plaintiff argues
that her claim of negligent hiring, retention, training and supervision falls into an exception to
this general rule because Plaintiff "is seeking punitive damages from [the NYPD] based on *gross*
negligence in hiring, training, or supervising [its officers]."  (Pl.'s Br. 21 (emphasis added)
(citing *Karoon v. N.Y.C. Transit Auth.*, 659 N.Y.S. 2d 27 (App. Div. 1997)).)  Defendants do not
respond to this argument.

With respect to negligent hiring, retention, and supervision, Plaintiff's allegations are
essentially silent.  (*See generally* Compl. (offering no specific allegations concerning the
NYPD's hiring, retention, or supervision of the officers in question).)  The Court therefore grants
Defendants' motion as to those claims.  However, for the reasons stated above in finding that
Plaintiff has sufficiently pled a claim of negligent training under 42 U.S.C. § 1983, the Court
finds that Plaintiff has plausibly alleged gross negligence in failing to train the officers who
administered Plaintiff's official Department photograph at Central Booking.  *See supra.*
Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's State law claim of
negligent training.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. The following claims shall proceed to discovery: (1) negligent training under 42 U.S.C. § 1983; (2) negligent training under New York law; (3) religious discrimination under the New York Constitution; and (4) intentional infliction of emotional distress only against the yet unidentified individual officer John Doe Defendants. Defendants' motion to dismiss is granted as to Plaintiff's other claims, as explained more fully in this opinion.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2017
      Brooklyn, New York